**AFFIRM; Opinion issued March 27, 2013**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-11-00995-CR**

**GERARDO REYNA, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 203rd Judicial District Court
Dallas County, Texas
Trial Court Cause No. F10-00678-P

## OPINION

Before Justices FitzGerald, Fillmore and Richter[1]
Opinion by Justice FitzGerald

A jury convicted appellant of murder, and then heard evidence relevant to punishment, including proof that appellant had previously been convicted of murder as an adult and had also been placed on probation at the age of seventeen for a murder, aggravated assault, theft of an automobile, and burglary of a habitation. The jury found the allegations in the enhancement paragraph of the indictment true, and sentenced appellant to life imprisonment. On appeal, appellant argues the evidence is insufficient to support his conviction, and the trial court erred in denying his challenges for cause to three prospective jurors. Appellant further asserts that remarks by the trial court "impaired the presumption of innocence," and the trial court erred in

---

1. The Hon. Martin E. Richter, Retired Justice, Sitting by Assignment.

admitting the prior inconsistent statements of a witness. We conclude the evidence is sufficient to establish appellant committed murder, and the trial court did not err in denying appellant's challenges for cause or in allowing the prior inconsistent statement. We also reject appellant's assertion that the presumption of innocence was impaired. Resolving all of appellant's issues against him, we affirm the trial court's judgment.

## Sufficiency of the Evidence

In his first issue, appellant maintains the evidence is insufficient to support his conviction because the State failed to establish he committed the offense. Specifically, appellant contends there was no reliable evidence to establish he was the individual who shot the victim. The State responds that the evidence is sufficient, and the weight to be afforded such evidence was within the province of the jury to decide. We agree with the State.

We apply the appropriate legal sufficiency standard of review. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). In so doing, we "view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Adames*, 353 S.W.3d at 860. We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *See id*. (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). In conducting our review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). We must presume that the factfinder resolved any

conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326; *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012).

As applicable here, a person commits murder if he "intentionally or knowingly causes the death of an individual" or if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. 19.02(b) (West 2011). The evidence shows that a shooting occurred at about 11:30 p.m. on June 15, 2008 in a residential area in Irving. Sergeant Paul Tong, the first officer to arrive at the scene, indicated that he found the victim, Carlos Membreno, with a visible gunshot wound to his lower abdomen. Membreno's body was lying near the rear of a Lincoln Aviator SUV parked on the south side of the street, and Sergeant Tong opined that Membreno was dead when he arrived. Also present at the scene were Sonya Parks and Jesus Cardenas, who identified the suspect as a Hispanic male driving a black Lincoln. Later, Parks identified the shooter as appellant, an acquaintance of hers. Sergeant Tong found two small-caliber casings near the vehicle. The rear hatch and the passenger door to the vehicle were open, and there were bottles of alcohol near the vehicle.

Parks testified that on the afternoon of June 15 she was preparing to go out on a date with Membreno. Parks invited her best friend, Jessica Duncan, to join them. Duncan had recently ended a relationship with appellant, and is the mother of his two-month-old child. Membreno and Cardenas picked up Parks and Duncan at about 7:30, and they left the child with a babysitter. The group stopped at a restaurant and bar, and then drove around searching for a place where Cardenas could obtain a tattoo. During this time, the men consumed a great deal of alcohol. As the group drove around town, appellant called Duncan on her cell phone repeatedly. According to Parks, Duncan and appellant seemed to be arguing about something, and at one point, Duncan

3

hung up on appellant. Eventually the group decided to call it a night, and stopped to pick up the child on the way back to Parks's home. After retrieving the child, Parks observed a black Lincoln automobile approaching from the other way. The vehicle turned onto Ross Drive just in front of them, and Duncan remarked, "there he goes, he's going to get there before us." Parks urged Membreno not to stop at her house, but Membreno got upset with her "for being a girl and being scared." When Membreno pulled the car up to the curb in front of Parks's house, appellant was parked in the driveway of a house further down the street.

Parks and Membreno exited the vehicle and went to the rear hatch area to get Duncan's baby stroller. Parks observed appellant approaching them and ran away as fast as she could. She jumped a neighbor's fence, and was hiding in the backyard when she heard two gunshots. Then, Duncan yelled for her and Cardenas yelled for someone to call an ambulance. Parks returned to the vehicle and saw Membreno lying on his back behind the SUV. Duncan got into her car and left the scene. When Parks went over to Membreno, he was lying on the ground gasping for breath. Membreno eventually stopped breathing, and the paramedics took him away. The evidence shows Membreno died as a result of two gunshot wounds, one to the left abdomen, and one to his back.

Cardenas testified that when the group returned to Parks's home that evening, he initially remained in the vehicle drinking tequila and listening to music. When he noticed a red beam of light shining at him, he got out of the vehicle. When he exited, he discovered that the light was attached to a gun held by a man who was advancing toward him. Cardenas ducked and walked to the back of the vehicle, and as the man got closer, began to run. When Cardenas heard a bang, he started to run faster. As he was running, he heard more shooting. When he turned back, he saw the black Lincoln speeding away.

Cardenas returned to the vehicle, and found Membreno lying in the street. Membreno had no heartbeat, and he did not appear to be breathing. Cardenas was able to stop a passing vehicle to request that the driver call 9-1-1. Before the police arrived, Parks told him the shooter was "Jessica's baby daddy, Gerardo."

Jessica Duncan testified that she went out with Parks, Membreno, and Cardenas the night of June 15, 2008. While the group was riding around, appellant called her three or four times, and was upset with her for going out a second night in a row and because she was out with drunk men. During the last conversation, Duncan told appellant where she was headed, and appellant's car met them once her group arrived in the area of Parks's house. Although Duncan noticed the black car parked ahead of them, she never saw anyone get out of it. Because she was worried that she and appellant would start arguing, Parks asked the men to remain in the vehicle.

Duncan testified that she "heard some muffled argument and two gunshots and that's it." She said she "froze" for a while and that once she looked up appellant's car and everyone else were gone. Parks and Cardenas then reappeared, and Duncan asked Parks to return her purse to her. She got her purse, panicked, and left.

Duncan stopped at a gas station, and appellant met her there. Duncan recalled that she and appellant argued about something, perhaps because appellant was telling her to go home, and she preferred to spend more of the evening with him. Duncan convinced appellant to come spend time with her at a motel, where she was able to rent a room.

While they were at the motel, appellant kept receiving text messages from his girlfriend, Diana. Duncan and appellant continued to argue, and appellant left the motel. Duncan was unable to remember whether appellant told her anything about the shooting at that time. Despite all their discord, Duncan was supposed to meet appellant within a couple of hours at his home.

5

Duncan arrived at appellant's house in time to see Diana leave. According to Duncan, she went inside to prepare a bottle for the baby and did not speak with appellant. Diana returned, spoke with appellant and left again, apparently without realizing Duncan was in the house. After Diana left the second time, Duncan and appellant began talking. During this time, Duncan spoke with her mother by telephone twice. During the second conversation, she learned that the police were looking for appellant.

Then, appellant took Duncan and the baby to his friend Mike Livermore's house because he had "lots of things to do." Duncan acknowledged that she questioned appellant about why he had shot Membreno, but apparently got no answer to that question at that time. Duncan also reported that at one point she overheard a conversation on the speakerphone between appellant and a man named Roman Medina. During the conversation, Medina told appellant that he (Medina) was getting pulled over by the police.

On cross-examination, Duncan testified she told the Irving Police several things about her discussions with appellant and the murder that were untrue. Duncan said that "they had sent CPS to my house the day before then and then they made me bring . . . the baby with me to give my statement, and [the Detective] was very, like, forceful, I guess, with using CPS . . . . He kept saying that as long as I like cooperated or whatever, that everything would be fine because CPS was looking to him to what they were going to do."

Andrea Bukowski testified that she lived across Ross Drive from Parks. On the night of the shooting, Bukowski heard screaming and her dog barking, so she went to her front window to see what was going on. As she approached her window Bukowski heard a gunshot. She peered out the window toward Parks's house and saw a dark SUV, with "a guy laying on the ground

6

alive, and . . . another guy pointing a gun at him . . . [and] another guy with no shirt on screaming, and then two other girls screaming at the guy with the gun." According to Bukowski, the guy lying on the ground asked the guy with the gun "to stop," but another shot was fired. Bukowski made clear that the lighting was poor and she never saw enough of the gunman to be able to recognize him again, although she thought he was Hispanic.

Michael Livermore, a friend of appellant's, testified that between 7:00 and 8:00 a.m. on June 16, appellant, Duncan, and their baby unexpectedly arrived at Livermore's house. Appellant told Livermore that "something had happened." Appellant and Duncan then went out to Livermore's backyard, where he observed them having a "serious" discussion. When appellant came back inside, he told Livermore he had "done something bad — that he had shot somebody." Appellant subsequently left the Livermore residence, but Duncan and the child remained. Appellant returned later that afternoon, and Livermore saw Duncan go outside to speak to appellant once again. Appellant then left and Livermore did not see him again.

Roman Medina testified that appellant contacted him by text message around 8:30 a.m. on June 16 and requested that Medina pick up some money, clothes and a handgun from appellant's house. Consequently, Medina went to appellant's house, entered through the unlocked front door and went to the bedroom to gather clothes and try to open a safe. Medina said he was speaking with appellant on a telephone while he was in appellant's house, but was unable to get the key he was using to open the safe.

When Medina arrived at appellant's house, another man was also present, and assisted in loading things into Medina's car. Medina had seen the man before, but knew him only as "Gordo." Gordo and Medina left the residence in separate vehicles. Medina planned to meet appellant at a barber shop he and appellant owned. But as Medina left the house, he suspected he

was being followed by two pick-up trucks. The trucks were eventually replaced by marked police cars. Medina called appellant to tell him the police were following him, and was subsequently pulled over.

Dallas Police Officer Natascha Hunt testified that she participated in the apprehension of Medina. After Medina was pulled over, Officer Hunt learned that Medina was in a car that was seen leaving a murder suspect's home. When inventorying the vehicle after Medina's arrest, officers found three empty gun cases, three magazines, two of which were loaded with "five point seven ammunition," clothing, and a small safe.

Susan Allen, a trained firearms examiner, later identified the gun cases as the type that house a particular type of semi-automatic pistol called a "five-seven." These firearms, called the FN Herstal, are Belgian-made and "very expensive." A specific kind of ammunition is required, and FN is the only company that currently makes the ammunition. These handguns can be accessorized with a red laser-beam target-identification device.

Allen testified that each of the gun cases had a test-fired cartridge in it.[2] Allen compared the test-fired cartridges from the cases to the cartridge casings recovered from the crime scene and concluded that the two "did not identify." But the two cartridge cases found at the crime scene were fired by the same type of gun— a "five-seven pistol." And the two bullets extracted from Membreno were fired from the same type of gun, also a "five seven pistol." Therefore, while the casings from the crime scene were not the same as the test-fired cartridges, the gun cases, the test-fired cartridges, and the casings found at the crime scene all involved "five-seven" type handguns. Allen concluded "there is a fourth gun case out there, we just don't have it."

---

2. Allen explained that manufacturers will frequently include a test-fired cartridge in the gun case to demonstrate to the owner that the gun has been fired and is working.

8

Dallas Police Officer Kurt Hibits was assigned to the fugitive task force at the United States Marshal's office, and testified about appellant's apprehension. Officer Hibits received a call identifying appellant as a fugitive murder suspect, and after conducting interviews, identified a target area where appellant might be located. Appellant was found in the parking lot of an east Dallas motel. When the officers first approached him, appellant ran. Officer Hibits attempted to tackle appellant, but appellant punched him and continued to run. The officers eventually caught appellant and arrested him.

After appellant was arrested, his hands were tested for gunshot residue. David Spence, supervisor of the trace evidence section of the Southwest Institute of Forensic Sciences crime lab testified that there was one particle consistent with gunshot residue on the back of appellant's right hand. Spence clarified, however, that the type of particles found in gunshot residue are not exclusive to gunshot residue and have been found in other sources.

Appellant complains the State's evidence is insufficient because none of the witnesses saw him shoot Membreno and the forensic testimony did not conclusively link him to the crime. Appellant further complains that the witnesses were "convicted felons" and therefore not credible. For example, Parks was on probation and admitted she "had a problem" with appellant's brother. Cardenas was intoxicated on the night in question, and admitted that he had federal drug and weapons charges pending and hoped to have his sentence reduced. Medina had a pending case for unlawful possession of a firearm by a felon, and Livermore a pending charge for manufacturing methamphetamine with intent to deliver. Appellant further insists that his attempts to flee could have resulted from a desire to avoid apprehension for a crime he claims he did not commit.

In assessing the legal sufficiency of the evidence, however, the *Jackson* standard of review "gives full play to the jury's responsibility fairly to resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from the evidence." *Threadgill v. State*, 146 S.W.3d 654, 663 (Tex. Crim. App. 2004). When the record supports conflicting inferences, we presume the fact finder resolved the conflicts in favor of the prosecution, and defer to that determination. *Jackson*, 443 U.S. at 326.

Applying this presumption here, we conclude that a rational jury could have determined that appellant intentionally caused the death of Membreno. Appellant and Duncan were in contact via text message throughout the night, and appellant was angry that Duncan was out with two intoxicated men. Duncan told appellant the group was on the way to Parks's house, and as appellant turned in front of them, Duncan exclaimed "there he goes, he's going to get there before us." Although Duncan subsequently denied seeing appellant at the scene, she admitted that she saw his car. Immediately after the murder, Parks identified appellant as the person wielding a gun.

On the morning after the murder, appellant told Livermore he had shot somebody, and then had Medina retrieve clothing, money and weapons from his home. That same day, Duncan remarked to appellant that she could not believe he had done "this." When the police finally caught up with appellant, he attempted to flee. Unique types of handguns and ammunition of the same type as used in the murder were among the items Medina removed from appellant's home for him. Therefore, on this record, we conclude the evidence is sufficient to support appellant's conviction. Appellant's first issue is overruled.

*Challenges to the Venire*

In his second, third, and fourth issues, appellant complains the trial court erred in denying his challenges for cause to prospective jurors Miller, Townsend, and Kinzer. To preserve error for a trial court's erroneous denial of a challenge for cause, appellant must show that: (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010); *Sells v. State*, 121 S.W.3d 748, 759 (Tex. Crim. App. 2003). In the instant case, there is no question that appellant complied with these requirements with regard to the venirepersons addressed below.

Article 35.16(a)(9) of the code of criminal procedure requires that a prospective juror be dismissed for cause when challenged if the juror "has a bias or prejudice in favor of or against the defendant." TEX. CODE CRIM. PROC. ANN. art. 5.16(a)(9) (West 2006); *Anderson v. State*, 633 S.W.2d 851, 853 (Tex. Crim. App. 1982). Bias is an inclination toward one side of an issue rather than to the other which leads to the natural inference that a juror will not act with impartiality. *Anderson*, 633 S.W.2d at 853.

A trial court's decision to deny a challenge for cause will not be overturned absent a "clear abuse of discretion." *See Burks v. State*, 876 S.W.2d 877, 893 (Tex. Crim. App. 1994). In determining abuse of discretion, we review the record to determine if it supports the trial court's implied finding that the prospective juror's views would not "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *See id*. (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). We undertake our review with considerable deference to the trial court's ruling because the trial judge is in the best position to

evaluate a venire member's demeanor and responses. *See Gardner v. State*, 306 S.W.3d 274, 295– 96 (Tex. Crim. App. 2009). When a venire member's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *Id*.; *Feldman v. State*, 71 S.W.3d 738, 747 (Tex. Crim. App. 2002), *superseded by statute on other grounds*, TEX. CODE CRIM. PROC. ANN. art. 37.071, *as recognized in Coleman v. State*, No. AP–75478, 2009 WL 4696064, at *11 (Tex. Crim. App. Dec. 9, 2009) (not designated for publication).

To show harm for the erroneous denial of a challenge for cause, the appellant must show that the trial court's failure to strike a challengeable juror forced him to use a statutorily-allotted peremptory strike on the challengeable juror, which left him unable to strike an objectionable juror who then sat on the jury. *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007). Within this framework, we examine the challenges to prospective jurors Miller, Townsend, and Kinzer.

### Juror Miller

During group voir dire, appellant's trial counsel asked:

> Would you start somebody – a police officer off at the same level that you would set – that you would any other witness, whether it's Irving Police Department – just in general, do you think that a law enforcement officer is automatically going to get more – you're going to believe them or start them off with more credibility than any other witness that you don't know?

Miller responded, "I think they have better training for attention to detail." Counsel then inquired whether the officer would automatically be more credible, and Miller responded "yes." Prospective jurors Fulcher, Davenport, Townsend, Kinzer, and Kaminski all indicated they agreed with Miller's statement. Later, Miller was called into the courtroom for individual voir dire. The court started the questioning, and asked, "are you going to start everybody out who takes that witness stand on the same level, or are you going to automatically assume the police officer is going to tell the truth more than anybody?" Miller answered, "I sort of categorize the

12

types of questions that the policemen would be more likely to be believed than others. I think a policeman or police woman is more likely to pay attention to detail, to be able to assess facts just because of their training." The prosecutor then asked Miller whether she would start with the assumption that a police officer is more truthful than others. Miller stated, "No, not more truthful, just a better witness." Then, the following exchange occurred:

> DEFENSE COUNSEL: So please don't let me put words in your mouth, but are you saying that you think you start police officers thinking their testimony is more reliable? Truthful is not a good word. You just think they are more likely to be right than someone else who is not a trained police officer?

> MILLER: Yes. I think that their – that their memory of the situation or the investigation is more likely to be reliable, yes.

> DEFENSE COUNSEL: That you can rely on that more than you could somebody else, I think that's what you were saying?

> MILLER: Yes. That's the better word than truthful.

Although the trial judge initially indicated she was going to grant defense counsel's challenge for cause as to Miller, after an off-the-record conversation, the court stated, "I think we're talking about apples and oranges here. I mean, relying on a police officer's training and whether or not the police officer is truthful, to me is two different things." Then, the judge indicated she would stick with her initial ruling in favor of the defense.

### Juror Townsend

Having indicated that he agreed with Miller's statement during group voir dire, Townsend was also called to the courtroom to be questioned individually. Defense counsel asked, hypothetically, whether Townsend would "start the police officer off as more credible than a lay person when they take the witness stand." Townsend initially stated, "I would be more inclined to expect honesty from a police officer than I would someone that was connected with a defendant." Townsend then clarified, "Not that I would doubt that person once they testified, but

my first inclination — if I believed them — but my first inclination would be to accept testimony from a police officer." When the prosecutor asked, "Are you saying that just because someone is a police officer they're going to be more credible or truthful than someone else?," Townsend replied, "No, that's not what I intended to say." Later, the prosecutor asked whether Townsend would believe a police officer more than anyone else, and Townsend responded, "No, I wouldn't think so. No, not under those basis, not under those circumstances."

*Juror Kinzer*

During the group voir dire, Kinzer also agreed with Miller's general statement that she would find police officers more credible because of their training. When questioned individually, Kinzer stated that he gives more credence to police officers because they have more training. Counsel for the defense asked, "Do you think— and that's before they take the witness stand, because of by virtue of their profession, you're assuming they're going to be more reliable and credible than a lay witness," and Kinzer responded affirmatively. The following exchange then occurred between Kinzer and the prosecutor:

> PROSECUTOR: I understand what you are saying, they have training and experience to do their job better than say I would do their job, okay? But are they more truthful just because they're police officers?
>
> KINZER: Not necessarily.
>
> PROSECUTOR: Okay. And so when you're saying they're more credible, are you using the word "credible" to describe their job performance rather than their ability to come up here and be honest on the witness stand?
>
> KINZER: Their job performance.

Upon conclusion of the individual voir dire, the trial judge stated, "I think we're all sort of miscommunicating here. I think these people are saying that if it's a question put to them regarding their training, maybe something technical, then they're going to give more credence to the police officer. But as to whether or not they're telling the truth, they're going to put

everybody on the same playing field. And that's what I think that they're saying." Consequently, the trial court overruled the challenges for cause as to Townsend and Kinzer, and reversed her ruling to allow Miller back on the jury. The trial court further denied defense counsel's request for three additional strikes. Prior to the seating of the jury, defense counsel noted for the record that she had used three of her peremptory challenges to strike Miller, Kinzer, and Townsend. She also identified three other jurors who were about to be impaneled and stated that she would have stricken those jurors had she not exhausted her strikes with Miller, Kinzer, and Townsend.[3]

In support of his contention that the trial court's denial of the challenges for cause was in error, appellant relies on an unpublished opinion, *Burke v. State*, No. PD-1398-11, 2012 WL 2415527, at \*5 (Tex. Crim. App. June 27, 2012) (not designated for publication). Appellant's reliance is misplaced, as *Burke* is clearly distinguishable from the facts in this case. In *Burke*, the court of criminal appeals noted that the challenged venire member, Yoast, unequivocally stated that he could not be fair and impartial about testimony from a police officer. *Id*. at \*3. During voir dire, Yoast indicated that his negative feelings about the police arose from a personal encounter that was similar to the incident for which the defendant was being tried. *Id*. at \*4. The court concluded that, taken as a whole, Yoast's testimony "established that his prejudice toward police officers would not allow him to follow the juror's oath and deliver a verdict based only on the evidence presented to the jury at trial." *Id.*

Likewise, in *Hernandez v. State*, 563 S.W.2d 947, 950 (Tex. Crim. App. 1978), the court of criminal appeals concluded that a panelist who stated she would always believe police officers was biased as a matter of law. *Id.* But the court subsequently clarified that its holding in *Hernandez* should not be read to mean that a venire member is subject to a challenge for cause

---

3. Counsel did not specify why she would have stricken the other jurors. While the record reflects that one of the jurors agreed with Miller's general statement during group voir dire, the record is silent as to why the two remaining jurors might have been deemed objectionable.

simply because he would be more skeptical of a certain category of witness generally. *See Jones v. State*, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998). "[L]itigants are entitled to jurors who will be genuinely open-minded and persuadable, with no **extreme** or **absolute** positions regarding the credibility of any witness." *Id*. (emphasis added). The court further noted that jurors need not be completely impartial and free of any trace of skepticism toward any category of witness. *See id*. "Complete impartiality cannot be realized as long as human beings are called upon to be jurors." *Id*.

Our sister court in Houston was presented with a situation similar to the case at bar. *See Williams v. State*, 313 S.W.3d 393, 401 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). In *Williams*, a venire member stated he might give more credibility to a police officer's training and experience. In a subsequent inquiry, the trial judge asked, "Is it because of his training and experience or just because of his uniform?" The venire member responded "training and experience." *Id*. Denying the challenge for cause made to the venire member, the trial court noted, "It appears to me that he is basing his statement that he would give a police officer more credibility based on his training and experience, which would be true of anyone with a certain amount of expertise . . . not simply because he has a badge." *Id*. at 401–02. The Houston Court of Appeals agreed, concluding that the juror was not statutorily disqualified from service, biased, or otherwise subject to challenge for cause. *Id.* at 402. In so holding, the court observed, "the record shows [the juror] said he would be fair and impartial and would decide the case on the merits." *Id*.; *see also Harris v. State*, 784 S.W.2d 5, 21 (Tex. Crim. App. 1989) (concluding juror who would afford more weight to police officer's testimony but also stated he could be fair and impartial was qualified to serve).

Significantly, in the present case, none of the three jurors indicated he would judge the truthfulness of any one witness differently from the other. Although defense counsel endeavored to equate the jurors' assessment of professional skill and reliability to a predisposition toward veracity, we agree with the trial court that the jurors' testimony as a whole is indicative of a proverbial "apples to oranges" distinction. Moreover, there is nothing to indicate any of the three challenged jurors were unable to honor the oath and deliver an impartial verdict based upon the evidence. Indeed, none of the jurors expressed a bias or prejudice in favor of or against appellant, or any other unequivocal predisposition to the type of partiality we equate with disqualifying bias. Therefore, affording the requisite deference to the trial judge's assessment of the jurors' demeanor and responses, we conclude the trial court did not abuse its discretion in denying appellant's challenges for cause. Appellant's second, third, and fourth issues are overruled.

*The Presumption of Innocence*

Appellant's fifth issue assigns error to remarks made by the trial judge which appellant claims impaired the presumption of innocence. The State responds that appellant failed to object, and therefore the issue has not been preserved for our review.

When the trial court brought the venire members into the courtroom for voir dire, the judge stated:

> Sorry you had to wait out in the hall. There are just some matters we have to take care of prior to you coming in. We've got to get a seating chart ready and we're having elevator problems, so it took a while to get the defendant up. So I apologize for that.

Defense counsel moved for a mistrial stating, "It could have given — it probably informed the jury or could have the affect [sic] of informing the jury that the defendant was in custody."[4] The court responded:

> I'm going to deny that motion. I don't remember exactly what was said, but I do know that I said there were some elevator problems, but since there are elevators all over the building and since the defendant is dressed out in a suit, I'm going to deny the motion.

Appellant contends the trial court's comments "invited the jury to speculate and conjecture as to why he was being brought up in a separate elevator," and this impaired the presumption of innocence to which appellant was entitled in violation of article 2.03(b) of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 2.03(b) (West 2005). In essence, article 2.03(b) provides that the trial court, attorneys, and all peace officers are to conduct themselves as to insure a fair trial and not impair the presumption of innocence. *See id*. In addition, "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle v. Williams*, 425 U.S. 501, 503 (1976).

In support of his argument, appellant relies on *Oliver v. State*, 999 S.W.2d 596, 598 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). The facts in *Oliver,* however, are not analogous to the facts in the instant case. *Oliver*, like many of the cases involving an alleged impairment of the presumption of innocence, involved trial of the defendant in her prison uniform. *Id.* When counsel objected, the trial court overruled the objection, concluding the defendant's family could have provided alternative clothing. The court of appeals reversed, holding that compelling a defendant to proceed to trial in prison clothes contaminated the presumption of innocence and denied the defendant a fair trial. *Id*. at 599-600; *see also*, *e.g,*.

---

4.   The State fails to explain how this was insufficient to preserve the issue for our review.

*Randle v. State*, 826 S.W.2d 943, 944–45 (Tex. Crim. App. 1992) (trying prisoner in shackles and prison uniform violates presumption of innocence).

We disagree that the effect on the jury stemming from the trial judge's comments, if any, equates to the recurring impression created when a defendant appears throughout trial in handcuffs, shackles or jail clothing. The ambiguous statement by the judge did not identify who was responsible for getting appellant to the courtroom or which elevator he was taking, nor did it constitute the equivalent of a "trapping of guilt" as appellant suggests. The comment did not inform the jury that defendant was in custody, or in any way taint the presumption of innocence. Rather, the trial judge's comment merely referenced the functionality (or lack thereof) of the county facilities to explain why the proceedings had been delayed. Nothing in the record suggests that the comment in any way undermined the impartiality of the jury in their determination of guilt.

We also reject appellant's suggestion that the comment resulted in the jury's imposition of a life sentence. In light of the violent, senseless nature of the crime and appellant's previous convictions, we are unable to conclude that an ambiguous comment about a malfunctioning elevator influenced the jury's assessment of punishment. Appellant's fifth issue is overruled.

### Admission of Prior Inconsistent Statement

In his final issue, appellant asserts the trial court erred in admitting the prior inconsistent statements of witness Jessica Duncan. According to appellant, the State called Duncan as a witness "as a mere subterfuge to get before the jury evidence not otherwise admissible."

When reviewing a trial court's decision to admit or exclude evidence, we apply an abuse-of-discretion standard. *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). The

19

trial court does not abuse its discretion unless its ruling lies "outside the zone of reasonable disagreement." *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).

The credibility of a witness may be attacked by any party, including the party calling the witness. TEX. R. EVID. 607. A witness may be impeached with a prior statement when he gives testimony at trial that is inconsistent with the prior statement. *See Ayers v. State*, 606 S.W.2d 936, 939 (Tex. Crim. App. 1980).[5] However, the State may not call a witness that it knows will testify unfavorably for the sole purpose of impeaching that witness with otherwise inadmissible hearsay. *Hughes v. State*, 4 S.W.3d 1, 5 (Tex. Crim. App. 1999); *Kelly v. State*, 60 S.W.3d 299, 301 (Tex. App.—Dallas 2001, no pet.). To preserve error on this ground, defense counsel must object under rule 403. *See Hughes*, 4 S.W.3d at 4-5; *Kelly*, 60 S.W.3d at 300.

Prior to the time Duncan testified before the jury, the court conducted a sub rosa hearing concerning the admissibility of her testimony. During the hearing, Duncan was asked whether she intended to recant her prior statement to the police and testify differently at trial. Duncan replied, "Yes, depending. I mean some things might stay the same. I'm not sure." Other testimony at the hearing included the following:

> DEFENSE COUNSEL: So you're going to tell us under oath that you did not say the things that you told the Irving Police Department that you said?
>
> DUNCAN: Some of them, yes.
>
> DEFENSE COUNSEL: So the chief thing that you're going to test—that your testimony changes, is that you are going to say that you didn't—were not truthful and that it is not true that the defendant confessed that he committed the offense to you?
>
> DUNCAN: Yes, ma'am.

---

5. When a witness unequivocally admits to making a prior inconsistent statement, extrinsic evidence of the statement is not admissible. *See* TEX. R. EVID. 613(a). If the admission is partial, qualified, or otherwise equivocal, or if the witness claims not to remember making the prior statement, the prior statement is admissible for impeachment purposes. *See McGary v. State*, 750 S.W.2d 782, 786 & n.3 (Tex. Crim. App. 1988).

When Duncan completed her testimony, defense counsel objected under *Hughes,* and requested that the court conduct a balancing test to determine that all of Duncan's testimony was inadmissible. After considering argument from the State, the trial court ruled that the evidence would be admitted because "the State is not calling the witness strictly for impeachment purposes. "Defense counsel then stated, "So it's your ruling that there is no need for a 403 analysis, or you determined it's not prejudicial? The trial court responded, "No, it's not prejudicial."

When Duncan testified before the jury, she described the sequence of events leading up to the shooting. When the State asked Duncan whether appellant ended up behind the group while they were driving, Duncan initially responded in the negative. At this point, defense counsel re-asserted her *Hughes* objection, which the trial court denied. Counsel then requested and was allowed a running objection on "the prior inconsistent statements." When the State re-formulated the question to Duncan as "It's not true that you told Detective Cavazos, 'I'm not sure how, but somehow he ended up behind me'? Did you tell Detective Cavazos that?" Duncan replied "Yes I did."

Duncan continued to testify about meeting appellant at the gas station after the shooting and arguing with him, and the fact that she rented a motel room so that she could spend time with him. Duncan stated she did not recall telling police that appellant said, "I get so crazy over you," but did not deny making the statement.[6] Later, Duncan admitted that, consistent with her statement to the police, when she was conversing with appellant in Livermore's backyard, she said, "Can't believe you did this. What the F---." Duncan also admitted she heard appellant yelling instructions to someone over the phone, but did not specifically recall that appellant was

---

6.    Duncan's written statement was never offered or admitted into evidence.

21

yelling about a safe. Although Duncan stated that she did not recall telling the police that appellant said he got rid of the gun, she was clear that she was not denying the statement, but just did not recall making it.

The State also asked Duncan about her prior statements that appellant was at the scene of the offense, that she saw him "run over there," and thought appellant was going to "pistol whip them." Duncan denied seeing appellant at the scene at all, and claimed that when she made these statements she only meant to convey that she saw appellant's car at the scene. According to Duncan, the statements resulted from the detective "really hounding [her] with CPS" and because she was afraid of a criminal charge herself.

We deem appellant's objection sufficient, and proceed to consider whether the trial court abused its discretion in allowing Duncan's testimony.[7]

The determination of whether Duncan's testimony was improperly admitted because it was solely for the purpose of impeachment requires that we engage in a Rule 403 balancing test. *See Hughes*, 4 S.W.3d at 4–5. The analysis involves consideration of whether the State was surprised by the witness's recantation, whether the State was unable to elicit any favorable testimony from the witness, and whether the State had a legitimate purpose for eliciting the prior inconsistent statements. *See id.*; *Kelly*, 60 S.W.3d at 301.

Weighing those factors here, we cannot conclude the prejudicial nature of the testimony substantially outweighed its probative value. *See* TEX. R. EVID. 403. Although the witness indicated she planned to recant some of her prior statement to police, she did not state that she would recant her statement in its entirety, nor did she specifically identify those portions of the

---

7.  *Hughes* pertains to evidence that is "otherwise inadmissible." *See Hughes*, 4 S.W.3d at 5. Appellant objected to Duncan's statement in its entirety, but makes no argument that the entire statement or discrete portions were "otherwise inadmissible." Because the trial court gave a limiting instruction, we presume the trial court found at least some of the testimony inadmissible for purposes other than impeachment, and begin our inquiry with the Rule 403 analysis.

statement she planned to recant. In fact, the only inconsistency Duncan identified during the hearing concerned appellant's confession to the crime. Any other potential inconsistencies were left open for the State to discover during trial.

When the witness testified at trial, there were many statements she did not deny. She was never specifically asked whether appellant told her he committed the crime. Importantly, the State was able to elicit a considerable amount of favorable testimony from Duncan. And in addition to the fact that she was present at the scene of the crime, Duncan testified about matters pertinent to motive and the sequence of events.

Moreover, the trial court gave the jury a limiting instruction that mitigated any prejudicial effect of the testimony.[8] *See* TEX. R. EVID. 105(a) (evidence admissible for one purpose but not for another limited to its proper scope by instruction); *Hammock v. State*, 46 S.W.3d 889, 892 (Tex. Crim. App. 2001). Therefore, under these circumstances, we cannot conclude the trial court abused its discretion in admitting Duncan's testimony. Appellant's sixth issue is overruled.

Having resolved all of appellant's issues against him, we affirm the trial court's judgment.

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE

Do Not Publish
Tex. R. App. P. 47
110995F.U05

---

8.  The instruction read: ". . . if you have heard evidence of any prior inconsistent statement by a witness you may consider such statement in aiding you in determining the credibility of the witness and for no other purpose."



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GERARDO REYNA, Appellant

No. 05-11-00995-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 203rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F10-00678-P.
Opinion delivered by Justice FitzGerald,
Justices Fillmore and Evans participating.


Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered March 27, 2013.


/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE

24